**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 90-8273
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

TERRY JAMES PIERRE and OTIS HARRIS, III,

Defendants-Appellants.

_____

Appeals from the United States District Court
For the Western District of Texas
_____
(April 13, 1992)

Before POLITZ, Chief Judge, KING, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHE, WIENER, BARKSDALE, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

DAVIS, Circuit Judge:

Otis Harris and Terry Pierre appeal their convictions for possession of cocaine with intent to distribute and for conspiracy to commit the same offense. A panel of this court concluded that the district court erred in denying Harris' motion to suppress evidence found in a consent search of luggage at a fixed checkpoint in Sierra Blanca, Texas. Based on this determination, the panel reversed Harris' convictions. After en banc briefing and argument, we conclude that even if the checkpoint agent conducted a search, the search was not unreasonable.

The panel also gave plenary review to Harris' and Pierre's arguments that the evidence was insufficient to support their convictions. Based on this standard of review, the panel found the evidence sufficient to convict Harris of possession but insufficient to convict Pierre of either charge. Upon rehearing and reviewing the sufficiency of the evidence under the proper plain error standard, we find the evidence sufficient to convict both defendants on both charges. We also find no merit to Harris' argument that his conviction should be reversed because the prosecutor made an improper argument. We therefore affirm Harris' and Pierre's convictions.

## I.

In early November 1989, Terry Pierre, Derrick Turner and Calvin Broadnax drove from New Orleans to Los Angeles in a 1987 GMC Jimmy. During the one-week visit to Los Angeles these three men met Otis Harris, a New Orleans resident who had known Broadnax when they were children. He was looking for a ride back to New Orleans. Harris, Pierre and Turner stayed in various hotels in Los Angeles and Broadnax paid their expenses.

The day they left Los Angeles, the group stopped at an expensive residence where they were met by two men -- Don Tanner and "Rob" or "Bob". Pierre and Turner preceded Harris into the residence. Harris heard Tanner tell Broadnax that he was only able to get "four of them chickens". Broadnax replied that it was no problem because he had two. Harris testified that he did not realize the significance of the conversation at the time. He later

**2**

remembered that in street talk, "chicken" is a code word for a kilo of cocaine.

Broadnax and Tanner left the others who waited in the entertainment room of the house. Broadnax returned a few minutes later carrying a gray Samsonite suitcase. Broadnax left the house and returned about forty minutes later. Broadnax then told Harris, Pierre and Turner that he would not be returning to New Orleans with them and gave Pierre cash for expenses. A short time later the three men left Los Angeles for New Orleans in the GMC Jimmy. Pierre did the bulk of the driving until Harris took over just west of the Sierra Blanca checkpoint.

Border Patrol Agent Lonny Hillin stopped the Jimmy at the fixed checkpoint in Sierra Blanca, Texas. The two-door vehicle was equipped with tinted fixed rear windows. Harris was driving, Turner was in the passenger seat, and Pierre was lying down in the back seat. Harris rolled down the driver's window at the stop sign next to Agent Hillin. Hillin asked Harris and Turner about their citizenship. They responded that they were United States citizens. Hillin, who thought he saw someone in the back seat, asked Harris if anyone else was in the back. Hillin then "ducked [his] head in [the window] to get a clear view of the back seat" and to talk to Pierre about his citizenship. As he did so, Hillin smelled freshly burned marijuana. Harris and Pierre had rolled and smoked a marijuana cigarette in the Jimmy about an hour before arriving at the checkpoint.

Hillin did not indicate to the occupants of the Jimmy that he had smelled marijuana. He asked Harris to pull the vehicle over to the secondary inspection area. Once there, Harris exited the vehicle. Hillin asked Harris if he objected to his searching the luggage; Harris said he did not. Harris opened the back of the vehicle and lowered the tailgate. He then took out and opened each piece of luggage for Hillin to inspect. They reached the Samsonite suitcase last. Hillin testified that it was in an upright position propped against the rear seat of the vehicle. In that suitcase, Hillin discovered six tape-wrapped bundles that later proved to contain 13.8 pounds of cocaine.

The district court denied Harris' motion to suppress the drugs. A jury convicted Pierre and Harris on one count each of conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846, and one count each of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The government did not charge its principal witness, Turner. On appeal, both defendants argued that the evidence was insufficient to support their convictions. **United States v. Pierre**, 932 F.2d 377 (5th Cir. 1991). The panel held that the evidence was sufficient to convict Harris on the possession charge. **Id.** at 381. The panel, however, found the evidence insufficient to convict Pierre on either charge and reversed his convictions. **Id.** at 392, 394.

Harris also argued on appeal as he had in the district court that Agent Hillin conducted an illegal search. He contended that

4

agent Hillin violated rights secured to him by the Fourth Amendment when he inserted his head into the vehicle through the driver-side window and smelled the marijuana. He argued that the court should have suppressed the cocaine later discovered as a fruit of this illegal search. On this issue, the panel held that Hillin conducted a search when he stuck his head into the vehicle and that the search was unreasonable. The panel concluded further that Harris' consent to search the luggage was not sufficiently attenuated from the illegal search to cure the taint. **Id.** at 390-91. It determined therefore that the district court should have suppressed the evidence and reversed Harris' convictions.

On the court's own motion, we ordered rehearing en banc primarily to address this issue. **United States v. Pierre**, 943 F.2d 6 (5th Cir. 1991).

## II.

The search and arrests at issue took place at the Sierra Blanca checkpoint, a fixed checkpoint on Interstate 10 near the Texas-Mexico border. The key case establishing the constitutional limits of non-border checkpoint stops at this and other similar locations is **United States v. Martinez-Fuerte,** 428 U.S. 543 (1976). In that case the Supreme Court held that agents at fixed checkpoints may stop and briefly question the occupants of any vehicle without violating their Fourth Amendment rights. The Court agreed that the stops do intrude to some degree "on motorists' right to `free passage without interruption.'" But the Court reasoned that the government has a substantial interest in

5

conducting routine stops for inquiry at permanent checkpoints near the border to interrupt the flow of illegal aliens into the country from Mexico.  **Id.** at 557-58.

The Court also noted that "while the need to make routine checkpoint stops is great, the consequent intrusion on Fourth Amendment interests is quite limited."  **Id.** at 557.  In particular, "all that is required of the vehicle's occupants is a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States."  **Id.** at 558, quoting **United States v. Brignoni-Ponce**, 422 U.S. 873, 880 (1975). The Court recognized that officers may refer cars to the secondary inspection area for any or no reason.  **Martinez-Fuerte**, 428 U.S. at 562;  see also **United States v. Price**, 869 F.2d 801, 804 (5th Cir. 1989) quoting **United States v. Garcia**, 616 F.2d 210, 211 (5th Cir. 1980);  **United States v. Gonzalez-Basulto**, 898 F.2d 1011, 1012 (5th Cir. 1990).  If agents wish to search vehicles or their occupants, however, they must have probable cause or consent.  **Id.** at 567; **United States v. Jackson**, 825 F.2d 853 (5th Cir. 1987) (en banc).

In **Jackson**, the en banc court applied the holding in **Martinez-Fuerte** specifically to the Sierra Blanca checkpoint.  We held that Sierra Blanca is not the "functional equivalent" of the border; consequently full customs and immigration searches are not allowed. We also held that **Martinez-Fuerte** delineates the lawful scope of law enforcement action during stops at the Sierra Blanca checkpoint.  With this background, we turn to Harris' arguments in

this case that the district court should have suppressed the evidence as the product of an illegal search.

### III.

Harris argues that (1) Agent Hillin conducted a search of the car when he stuck his head in the vehicle to address the back-seat passenger, (2) the search exceeded the limits on checkpoint stops set in **Martinez-Fuerte** and **Jackson** and was therefore unreasonable because it was not based on probable cause or consent, and (3) his consent to search the luggage given in the secondary inspection area was not sufficiently attenuated from the initial illegal search to cure the taint.  Assuming without deciding that Hillin's actions did constitute a search, we nevertheless conclude that based on the particular facts of this stop Agent Hillin's conduct was reasonable.  Because this conclusion resolves the suppression issue, we need not address Harris' attenuation argument.

The Fourth Amendment bars only <u>unreasonable</u> searches and seizures.  The reasonableness inquiry is driven by a balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'"  **New York v. Class**, 475 U.S. 106, 118 (1986) (quoting **United States v. Place**, 462 U.S. 696, 703 (1983)).  <u>See also</u> **Delaware v. Prouse**, 440 U.S. 648, 654 (1979); **Jackson**, 825 F.2d at 860.  However, the intrusivenes of the search is not measured so much by its scope as by whether it invades an expectation of privacy that society is

**7**

prepared to recognize as "reasonable." **Katz v. United States**, 389 U.S. 347, 361 (1967) (Harlan, J. concurring). For fixed checkpoints, such as the one at Sierra Blanca, the Court has struck the balance by limiting the length and nature of questioning allowed during the stops. **Martinez-Fuerte**.

The Supreme Court's opinion in **New York v. Class**, 475 U.S. 106, 89 L.Ed.2d 81 (1986), provides an applied example of this reasonableness analysis. In **Class**, officers lawfully stopped a vehicle that was speeding and had a cracked windshield -- both violations of New York law. The driver exited the car. While the driver was talking with one officer, the other officer went to the car to record the vehicle identification number (VIN) to complete the traffic citation. When he did not find the VIN on the doorjamb, he reached into the interior of the car to move some papers obscuring the area on the dashboard where the VIN is located on later model cars. As he did so, the officer saw the handle of a gun protruding from under the front seat. The officer arrested the driver and charged him with criminal possession of a firearm.

The Supreme Court agreed with the New York Court of Appeals that the officer's intrusion into the interior of the car constituted a search. But the Court concluded, for several reasons, that the search was reasonable. First, the government's interest in requiring and obtaining the VIN is "of the first order." **Id.** at 118. Thus the occupants of a car do not have a reasonable expectation of privacy in the VIN when stopped for a traffic violation. Second, the officer's actions moving the papers

**8**

on the car's dash to reveal the VIN were specifically focused and were no more intrusive than necessary to locate the VIN. The court also concluded that the officer's conduct in moving the papers was less intrusive than a formal arrest for the traffic violations or ordering the driver to move the papers. Finally, the Court considered the added risk of danger to the officer if he had ordered the driver to return to the car to move the papers. **Id.**

This leads us to the key inquiry in this case: whether Agent Hillin acted reasonably when he put his head in the window of the Jimmy. On the particular facts of this case, we hold that he did. First, passengers of vehicles at fixed checkpoints near the border of the United States do not have a reasonable expectation of privacy in not being stopped and questioned about their citizenship. **Martinez-Fuerte** and **Jackson** make it clear that checkpoint agents may stop and query motorists about their citizenship and also require them to produce documents showing a right to be in the United States.

The physical features of the Jimmy made it difficult for Agent Hillin to speak with Pierre and verify his citizenship. The GMC Jimmy was a two-door model. The fixed rear windows were tinted obscuring visibility of the interior. Hillin questioned the front seat passengers of the car by peering in the open driver's window. But Pierre was lying down in the rear seat. From his position totally outside the vehicle, Agent Hillin could not clearly see and question Pierre.

9

We read **Martinez-Fuerte** and **Jackson** as giving Agent Hillin the right to question Pierre in an effective way about his citizenship. This included the right of the officer to have eye contact with Pierre during the exchange. Otherwise, Agent Hillin would have had little basis to evaluate Pierre's answers even if the officer could hear them. The vehicle owner in **Class** had no expectation of privacy in his vehicle identification number. Similarly, Pierre had no reasonable expectation that he could avoid an effective series of questions from the customs agent at a fixed checkpoint such as the one at Sierra Blanca. Thus the occupants of a vehicle stopped at a checkpoint have no expectancy that they will not be required to look an agent in the eye and answer questions about their citizenship.

Second, Agent Hillin's actions were no more intrusive than necessary to accomplish his objective. The district court's finding that "Agent Hillin . . . stuck his head through the driver's side window to ask Pierre and Turner their citizenship" is not clearly erroneous. The court did not find and the record does not compel a finding that Agent Hillin put his head in the window for any other purpose. The record does not disclose how far Hillin extended his head into the window. Harris points to no evidence however that Hillin intruded into the car any further than was necessary to see and communicate with Pierre. The vehicle had no rear window which could be rolled down or rear door to open allowing access to the passenger area which would have permitted Hillin to do his job in a less intrusive manner. Agent Hillin's

action in sticking his head in the driver's window was certainly less intrusive than requiring Pierre to get out of the vehicle. See **Class**, 475 U.S. at 118.

Finally, the Court in **Class**, in evaluating the reasonableness of the search, considered the safety of the officer. **Id.** at 116. This component also cuts against Harris. An agent at a checkpoint, for his own safety, would have good reason to position himself so he could see the person with whom he is speaking.

We therefore conclude that, even assuming Agent Hillin conducted a search when he stuck his head in the GMC Jimmy, it was not unreasonable and thus did not violate the Fourth Amendment. We emphasize however that our holding is fact specific and based on the peculiar facts of this case. This opinion does not give carte blanche authority to checkpoint agents to intrude into vehicles during citizenship inquiries. We hold that the agent acted reasonably when he stuck his head in the open window of the GMC Jimmy with its particular features to question an occupant he knew was present but could not otherwise see from the exterior of the car.                                    **IV.**

For reasons we explain above, Hillin was lawfully within the car when he smelled the burned marijuana. Thus, the evidence falls within the plain view (or plain smell) exception to the warrant or probable cause requirement. **Harris v. United States**, 390 U.S. 234, 236, 19 L.Ed.2d 1067 (1968); **United States v. Marshall**, 878 F.2d 161 (5th Cir. 1989). The smell of burned contraband gave Hillin probable cause to search the vehicle for suspected contraband.

**11**

**Marshall**, 878 F.2d at 163. "If probable cause justifies a search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." **United States v. Ross**, 456 U.S. 798, 825 (1982). Hillin properly searched the luggage with or without Harris' consent. The district court therefore did not err in denying Harris' motion to suppress the drugs the officers discovered in the search.

V.

Both Harris and Pierre also assert on appeal that the evidence was insufficient to support their convictions. Neither Harris nor Pierre moved for judgment of acquittal when the government rested its case or at the close of all the evidence. Consequently, this Court's review is limited to determining whether the district court committed plain error or "`whether there was a manifest miscarriage of justice.' Such a miscarriage would exist only if the record is `devoid of evidence pointing to guilt,' or . . . `because the evidence on a key element of the offense was so tenuous that a conviction would be shocking.'" **United States v. Ruiz**, 860 F.2d 615, 617 (5th Cir. 1988), quoting **United States v. Ivory**, 468 F.2d 613, 614 (5th Cir. 1972) and **United States v. Bullock**, 551 F.2d 1377, 1385 (5th Cir. 1977). We must review the evidence in the light most favorable to the jury verdict, including all reasonable inferences and credibility choices. **Ruiz**, 860 F.2d at 617. Under

12

the plain error standard[1] we find that the evidence was sufficient to convict Harris and Pierre for both possession and conspiracy to possess cocaine.

First, to convict the defendants of conspiracy under 21 U.S.C. § 846, the Government had to prove the existence of an agreement between two or more persons to violate the narcotics laws, that each conspirator knew of the conspiracy, intended to join it and did participate in the conspiracy. **United States v. Magee**, 821 F.2d 234, 238-39 (5th Cir. 1987). The existence of a conspiracy need not be proved by direct evidence, but may be inferred from circumstantial evidence indicating a "concert of action" between the alleged conspirators. **United States v. Espinoza-Seanez**, 862 F.2d 526, 536 (5th Cir. 1988).

On the facts of this case, the jury's verdict finding the defendants guilty of a conspiracy does not constitute manifest injustice. The record is far from "devoid of evidence" indicating

_____

[1] The panel cannot be faulted for giving plenary review to the appellants' sufficiency arguments. The government did not point out the defendants' failure to preserve this error. The government's failure to argue the correct standard of review on appeal does not, however, prevent us from measuring the argument against the appropriate standard of review.

As we said recently in **United States v. Vonsteen**:

The parties' failure to brief and argue properly the appropriate standard may lead the court to choose the wrong standard. But no party has the power to <u>control</u> our standard of review. A reviewing court may reject both parties' approach to the standard. . . . If neither party suggests the appropriate standard, the reviewing court must determine the proper standard on its own.

950 F.2d 1086, 1091 (5th Cir. 1992) (en banc) (internal citations omitted).

an agreement between Pierre and Harris to transport the cocaine from Los Angeles to New Orleans.  Pierre agreed with Broadnax to go with him from New Orleans to Los Angeles and then return to New Orleans.  Harris joined them several days before they left Los Angeles.  Significantly, Harris and Pierre entered the Tanner home at the same time Broadnax and Tanner discussed the acquisition of "chickens", a street name for cocaine.  Broadnax  and Tanner made no apparent effort to prevent Harris and Pierre from hearing this discussion.  Harris and Pierre were together when Harris saw Broadnax with the Samsonite suitcase at the Tanner residence. Based on Agent Hillin's description of the location of the Samsonite suitcase containing the cocaine in the Jimmy, the jury could infer that both Harris and Pierre knew it was there.  This inference is reasonable because the suitcase was visible from the passenger area of the vehicle and Pierre and Harris had both removed jackets from the rear of the Jimmy during the trip.  They also knew that the suitcase did not contain any of their personal belongings.  All the passengers of the vehicle had spent several nights in a hotel together before they loaded the Samsonite suitcase.  They were therefore familiar with the luggage that contained their personal belongings.

In addition, Broadnax apparently looked to Pierre as the leader of the expedition from Los Angeles to New Orleans because Broadnax gave Pierre the expense money for the trip.  The jury could question whether Broadnax would have financed their trip with no expectation of a quid pro quo.  The jury could also question

**14**

whether Broadnax would have given these men a valuable cargo of cocaine to transport across the country without telling them what they were carrying.  On these facts, the jury's verdict finding Harris and Pierre guilty of conspiracy is not plain error.

The essential elements to convict on the possession charge are (1) knowing (2) possession of drugs (3) with intent to distribute. **United States v. Anchondo-Sandoval**, 910 F.2d 1234, 1236 (5th Cir. 1990). We agree with the panel that the evidence was sufficient to convict Harris of possession with intent to distribute even under a plenary review standard.  Harris' possession conviction therefore necessarily withstands review under the plain error standard. For reasons stated above, the evidence supports the jury's finding that both men agreed to transport cocaine from Los Angeles to New Orleans and that a conspiracy existed between Harris and Pierre for this purpose.  It follows that the jury was entitled to find that Harris and Pierre knew the cocaine was in the vehicle and jointly possessed it.  They demonstrated their intent to distribute it by sharing the duty of driving it across the country.  The evidence therefore supports Pierre's possession conviction.  No manifest injustice occurred in the convictions of Harris and Pierre for possession with intent to distribute cocaine.

## VI.

Finally, Harris argues that a portion of the prosecutor's closing argument, in which he referred to Harris' and Pierre's criminal records, was improper and resulted in an unfair trial. The panel did not consider this argument because they reversed

**15**

Harris' convictions on other grounds.  Because of our disposition of Harris' other arguments, we must now consider this contention.

Harris' counsel did not object to the prosecutor's statements. Therefore, we limit our review to whether the court committed plain error.  Stated differently, we must determine whether the argument "seriously affected the fairness, integrity, or public reputation of the judicial proceeding and resulted in a miscarriage of justice."  **United States v. Goff**, 847 F.2d 149, 162 (5th Cir.) modified on reh'g, cert. denied sub nom., **Kuntze v. United States**, 488 U.S. 932 (1988).  To merit reversal, the defendant must persuade us that the jury would not have found him guilty in the absence of the prosecutor's improper argument.  **Id.**

To determine the potential prejudicial effect of the statements, we must consider the context in which the prosecutor made them.  **United States v. Robinson**, 485 U.S. 25, 33 (1988) (citing **Lockett v. Ohio**, 438 U.S. 586 (1978)); **United States v. Saenz**, 747 F.2d 930, 939 (5th Cir. 1984), cert. denied sub nom., **Solis v. United States**, 473 U.S. 906 (1985).  Some of the prosecutor's challenged remarks, standing alone, would be considered improper.[2]  However, when we read the argument as a whole and consider the remarks in conjunction with the defense counsels' closing arguments to which the prosecutor was responding, we find no impropriety particularly under the plain error standard.

---

[2] For example, the prosecutor referred to the defendants as "multiple felons" and as "well-travelled in the criminal justice system".  He also stated "Hey, they have been in jail.  They know what it is like.  Hey, they could take it."

**16**

In his initial argument, the prosecutor declared that this was a credibility case. He noted that the credibility contest was between two "multiple felons" and "a kid", referring to the government's witness Derrick Turner. This was a permissible use of prior criminal history to impeach a testifying defendant. Fed. R. Evid. 609. When Harris' attorney addressed the jury he re-emphasized his client's criminal record and asked the jury to only consider the facts of the present case in their deliberations. Pierre's attorney then argued that his client did not know the cocaine was in the car. He reasoned that because of his client's criminal record, he was too smart to smoke marijuana in a car containing drugs, especially just before he arrived at a checkpoint. The prosecutor in rebuttal responded that if the defendants were smart they would not be so well-travelled in the criminal system. He remarked in substance that the defendants had been in jail before, knew what it was like and thus had a strong motivation to testify in a manner that would keep them out of jail. Even if the prosecutor's arguments were improper, these references to the defendants' criminal records did not seriously affect the fairness of the judicial proceeding or result in a miscarriage of justice.

For the reasons stated above, the convictions of Otis Harris, III and Terry James Pierre are AFFIRMED.